*Montay D. Shuler v. State of Maryland*, No. 57, September Term, 2025, Opinion by Booth, J.

**JURY INSTRUCTIONS — VOLUNTARINESS OF CUSTODIAL STATEMENTS — "SOME EVIDENCE" STANDARD**

In a criminal case in which the defendant was charged with first-degree murder, second-degree murder, and voluntary manslaughter, the State sought to admit a defendant's custodial statement in rebuttal as a prior inconsistent statement for impeachment purposes. The trial court refused to give the defendant's requested voluntariness instruction set forth in Maryland Pattern Jury Instruction-CR 3:18.

The Supreme Court of Maryland held that the defendant failed to generate "some evidence" to support his requested instruction, and therefore, the trial court did not err in refusing to give it under the facts of this case.

**HARMLESS ERROR**

The Court further held that even if the trial court had erred in refusing to give the instruction, any error in not giving defendant's instruction on voluntariness was harmless beyond a reasonable doubt.

Circuit Court for Baltimore City
Case No.: 121306006
Argued: May 5, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 57

September Term, 2025

MONTAY D. SHULER

v.

STATE OF MARYLAND

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Opinion by Booth, J.
Watts and Biran, JJ., concur in part and
dissent in part.

Filed: July 20, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal arises from a trial court's refusal to instruct the jury on the voluntariness of statements made by defendant Montay D. Shuler during a custodial interrogation. In the Circuit Court for Baltimore City, the State charged Mr. Shuler with first- and second-degree murder, voluntary manslaughter, robbery with a dangerous weapon, and various firearms offenses, in the shooting deaths of two individuals during a marijuana purchase. Mr. Shuler testified that he acted in self-defense.

To impeach Mr. Shuler, the State introduced his prior statement denying all involvement in the shooting during a late-night, uncounseled custodial interview after his arrest. Although Mr. Shuler conceded that the statement was admissible, he requested a pattern jury instruction directing the jury that it could consider his prior statement only if it first found that the statement was voluntary. The trial court denied Mr. Shuler's request. Ultimately, the jury acquitted Mr. Shuler of first- and second-degree murder, but found him guilty of two counts of voluntary manslaughter, one count of robbery with a deadly weapon, two counts of use of a firearm in the commission of a crime of violence, and illegal possession of a regulated firearm. The court imposed a total sentence of 70 years' incarceration, with the first 10 years to be served without the possibility of parole.

On appeal, Mr. Shuler argued that the trial court erred in failing to give a voluntariness instruction. The Appellate Court disagreed and affirmed his conviction. *Shuler v. State*, 267 Md. App. 465 (2025). In the court's view, a voluntariness instruction was not required because (1) Mr. Shuler's prior statement was offered for impeachment purposes, (2) the statement was not a confession, but was instead exculpatory on its face,

and (3) the record did not include "some evidence" from which a jury could find Mr. Shuler's statement was involuntary. *Id.* at 508–09.

We granted Mr. Shuler's petition for writ of certiorari to answer the following questions, which we have slightly rephrased:

1. Whether the Appellate Court erred in holding that the defendant was not entitled to the pattern jury instruction on the voluntariness of his custodial statement because it was offered for impeachment purposes and the content of his statement was "exonerating."

2. Whether Mr. Shuler presented "some evidence" that his custodial statement was not voluntarily given to generate the voluntariness instruction.

For the reasons that we discuss more fully below, we answer the first question "yes," and the second question "no." We disagree with the Appellate Court's conclusion that Mr. Shuler was not entitled to the voluntariness instruction on the basis that the statement was offered only for impeachment purposes and the content of his statement was facially exculpatory. However, we agree with the Appellate Court's third conclusion—that the record did not include "some evidence" from which a jury could find that Mr. Shuler's statement was involuntary. Moreover, even if we were to assume that the trial court erred in refusing to give Mr. Shuler's requested voluntariness instruction, we determine that such an error was harmless beyond a reasonable doubt. Accordingly, we affirm the judgment of the Appellate Court.

2

# I

## Facts and Proceedings

### A. *Factual Background[1]*

On the evening of August 5, 2021, several 911 calls reported that a shooting occurred near the intersection of Flowerton Road and Wicklow Road in Baltimore City. The police responded to the 4300 block of Flowerton Road and found a red Ford Focus. Brian Palmer and Darrin Stewart, who were both deceased, were in the car. Mr. Palmer was in the driver's seat and Mr. Stewart was in the front passenger seat. Each man had been shot in the head twice and in the lower abdomen once.

Crime scene technicians recovered evidence at the scene, including bullets, bullet fragments, 9mm cartridge casings, suspected controlled dangerous substances, and a cell phone belonging to Mr. Palmer. A digital forensic download of Mr. Palmer's cell phone revealed that he had been texting a man named Raekwon Griffin about a narcotics sale. Specifically, Mr. Griffin was negotiating the purchase of a pound of marijuana from Mr. Palmer.

In the text messages, Mr. Griffin gave Mr. Palmer the address of 4313 Flowerton Road as the location to meet to complete the sale. Mr. Griffin asked if Mr. Palmer would "front him" the drugs, meaning that he would pay at a later date, but Mr. Palmer declined. Mr. Griffin then texted Mr. Palmer, "My brother going to be with me, we going half, if that's cool with you." Mr. Palmer wrote back, "That's fine, red Focus pulling up."

---

[1] The facts presented in this section are based on the testimony and other evidence introduced at trial.

One day after the homicides, at 7:53 p.m., Mr. Shuler was arrested when he was seen driving a white Subaru that a 911 caller had identified as fleeing the area immediately after the shooting. The police transported him to the station house, where, after being advised of his *Miranda*[2] rights, Mr. Shuler agreed to speak with detectives. In Mr. Shuler's statement to the detectives, which was videotaped, he denied being involved in the shootings or being in the vicinity when they occurred.

After the arrest, the police obtained a warrant to search the white Subaru, which was registered to Mr. Shuler. Under the driver's seat, the police found a Ruger 57 semi-automatic handgun that belonged to one of the victims. Mr. Shuler's and Mr. Griffin's fingerprints were found in the Subaru. The Ruger was ruled out as the murder weapon because the casings found at the scene were a different caliber.

Historical cell analysis of Mr. Shuler's and Mr. Griffin's phone numbers placed both cell phones near the scene of the murder at the time it occurred. Using Mr. Shuler's phone number, Sergeant Seong Koo[3] searched the jail call database and found that two calls were placed to Mr. Shuler's number from the Baltimore City Detention Center—one on the day of the murders shortly after they occurred and one the following day.

During the August 5, 2021 call, Mr. Shuler stated, "I just caught an and one" which, according to Detective Bryan Kershaw, who testified as an expert in code for criminal conduct, means "double murder." Mr. Shuler told the person at the detention center with

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] At the time of Mr. Shuler's arrest, Seong Koo was a detective. He was promoted to sergeant in May 2022. We will refer to him as Sergeant.

4

whom he was speaking that they "came up on a P"—meaning "pound." The person calling Mr. Shuler told him to hold onto the gun for him, and they discussed a $3,000 price for the gun. In the second call, Mr. Shuler stated that he was "holding onto [a 57]" and "got rid of the 9 right away."

### B. Mr. Shuler's Trial Testimony[4]

At trial, Mr. Shuler raised self-defense and defense of others, and he testified in his defense. Mr. Shuler gave the following account of the events that transpired on August 5, 2021. On that day, he encountered Mr. Griffin, a friend, who wanted to "buy some weed." They traveled in Mr. Shuler's Subaru to the street in front of Mr. Griffin's old residence on Flowerton Road and waited. When the red Ford Focus arrived, Mr. Griffin got out of the car and walked over to it. Mr. Griffin and the driver began to fight over money, and the driver reached for a gun. Mr. Shuler testified that Mr. Griffin and the driver "were fighting over one gun and the money at the same time." Mr. Shuler testified that he got out of his car, and he saw the passenger reaching under his seat. Mr. Shuler pulled out his own gun and shot the passenger. Mr. Shuler alleged that Mr. Griffin and the driver continued to fight, so Mr. Shuler also shot the driver. Mr. Shuler testified that he only shot twice, but because he was using a "ghost gun," it malfunctioned, and more than two bullets discharged. After Mr. Shuler shot the driver, Mr. Griffin had the driver's gun in his hand,

---

[4] The State tried Mr. Shuler twice for these crimes. The first trial resulted in a mistrial after the jury failed to reach a unanimous verdict. The issues before us relate exclusively to the second trial.

and Mr. Shuler took the driver's gun to "get rid of it." Mr. Shuler acknowledged that after the homicides, he received calls from a friend in the detention center.

When asked why Mr. Shuler did not tell the police his self-defense account of the shooting, he testified as follows:

> Because—I didn't tell them because I felt like I was going to get charged for murder and me telling them that I just killed somebody in self-defense is basically me admitting to first—well, not first-degree but murder which I know there's no self-defense law so I never would have gotten a chance for self-defense or no type of bail anything, so I just told them I didn't know nothing about it.

## C. *The State Seeks to Introduce Mr. Shuler's Custodial Statement*

After Mr. Shuler's testimony in the defense's case, the prosecutor indicated she intended to recall Sergeant Koo and to introduce Mr. Shuler's recorded statement to police in order to impeach his in-court testimony. The following exchange occurred:

> [PROSECUTOR]: It's the statement, I intend on introducing the Defendant's statement at this time.
>
> [DEFENSE COUNSEL]: Which? I don't think its admissible, Your Honor. The State needs to notify us in advance. We could have a motions hearing on it. You said you weren't going to use it so.
>
> [PROSECUTOR]: I don't think there's any requirement that the State notifies. Also, this is in the rebuttal case so.
>
> THE COURT: That's the only thing that I can think.
>
> [DEFENSE COUNSEL]: It's hard to argue it's not admissible.
>
> THE COURT: Don't do that, don't make me laugh.
>
> [DEFENSE COUNSEL]: I apologize, Judge. I mean, at this point, we need to be involuntary in the sense that it was beaten out of him and we're not contending that's what happened.

6

THE COURT: You can't contend that, and so I think the issue is you presented a case which you have a right to do, and she has a right to rebut it. This is—is it going to be a whole testimony, the whole statement?

[PROSECUTOR]: Yes, sorry.

* * *

THE COURT: What's in the statement?

[PROSECUTOR]: He says he lets other people use his car. He didn't know the gun was there.

THE COURT: I'm sorry?

[PROSECUTOR]: He says that he didn't know the gun was there, he lets other people use his car and denies any knowledge of the gun.

[DEFENSE COUNSEL]: It's a denial statement, essentially. So yeah, they arrest him. Do you know anything about this homicide? No, lots of people use my car. What about the gun? I don't know about the gun.

THE COURT: Really?

[DEFENSE COUNSEL]: He's playing cooperative.

THE COURT: All right, and 45 minutes of that? Can we just find some way to—and again, you know I'm just asking. Can we find some way to stipulate that he made a statement to the officers?

Again, that's between the two of you.

[PROSECUTOR]: I don't know about a stipulation. I'll think about it over lunch and see what we can do.

THE COURT: Okay.

[DEFENSE COUNSEL]: If Koo wants to say what he said, then—you know. There's not really a dispute about what he said.

[PROSECUTOR]: I don't know, I'm sorry.

THE COURT: No, the record's clear so I don't mind that I'm saying this.

7

I really do want to get this to them, but I absolutely do let you try the case the way you want. It just seems to me that if you two can talk and possibly work—and look, if you can't, I'm not mad at either one of you. You're both doing a great job but yeah, let's just see if that can be—and if not, like I said, it is what it is.

After the colloquy concerning the admissibility of Mr. Shuler's recorded statement, the discussion turned to jury instructions.

THE COURT: Now, the only other problem is if you do play the statement, you've already acknowledged that there's nothing about the statement that is objectionable.

[DEFENSE COUNSEL]: Yeah, I think he—we don't have a *Miranda* issue, and again, I don't think there's a voluntariness issue.

THE COURT: Let me ask you this. Do either of you think that if you choose to play the statement, is there another instruction that you think is needed or—?

[DEFENSE COUNSEL]: I think we need—

[PROSECUTOR]: The voluntariness—

THE COURT: The question is do you need that?

[PROSECUTOR]: I don't think we need it, Your Honor.

THE COURT: Are you using it as a prior inconsistent statement? I mean — so again what instruction—because I'm happy to give what we have, and you just say there's more testimony, but again if you two think about it, there's another instruction that's unique, I need to know because I've got to put it in, and I want to put it in quickly, so as soon as you—well, you'll—yeah.

[DEFENSE COUNSEL]: I would—out of an abundance of caution I would add voluntariness, Your Honor?

THE COURT: What do you mean by—when you say—voluntary statement or—?

[DEFENSE COUNSEL]: Yes.

8

THE COURT: I thought that you just said that you don't—again, I'm asking, that you don't believe it's an issue? So, here's the problem, I don't think this is relevant because you already acknowledged that it wasn't a voluntary—voluntary is just not an issue. So, if it's voluntary, and this [is] not an issue, then we don't need to get into all of the alleged, surrounding circumstances. It's a matter of what he said.

[DEFENSE COUNSEL]: I'll take a look. I think if there is any significant voluntary, that the truthfulness of the statement can be impacted by the custodial nature of the interrogation, but I'll—I understand where you are, Judge.

THE COURT: That's fine and so—but then I guess, let's see here.

So are you using it to impeach or are you using it to corroborate with his testimony here—because I guess here's the issue. If you're saying that he had other people in the car, let other people drive the car, what—again, I'm asking for this purpose, how is that relevant to what's been generated, that he had other people [i]n the car? He's already acknowledged that he had the car and obviously he had the gun.

[PROSECUTOR]: I'm using it to impeach.

THE COURT: So, if you're using it—what is it that you're impeaching then?

[PROSECUTOR]: Basically, his whole self-defense claim.

THE COURT: Huh?

[PROSECUTOR]: His entire self-defense claim, I mean, he—

THE COURT: No, I'm asking, I'm listening.

[PROSECUTOR]: Basically, his entire—the entire testimony that he just said, because at no point did he say literally anything that he said on the stand today during his statement and—

THE COURT: So that aspect of it, okay. So I guess I didn't need to give B, prior statement to impeach, you'll agree with, I mean, under the circumstances?

[DEFENSE COUNSEL]: It's fine.

9

THE COURT:  From a legal standpoint.

I'll give the—and then you'll talk to me quickly later on after lunch about whether or not—anything about the voluntary statement?

[DEFENSE COUNSEL]:  Yes.

THE COURT:  I'm inclined not to give it, but if you have a legal reason, I'll certainly hear it.

### D.  *Mr. Shuler's Custodial Statement to the Police Is Admitted*

Sergeant Koo testified that he, along with Sergeant Sufian Hassan, interviewed Mr. Shuler on August 7, 2021.  The video footage of Mr. Shuler's recorded statement to the two police officers was admitted into evidence without objection.[5]  The video recording of the interview shows that when the detectives entered the interview room to question him, Mr. Shuler was unshackled, lying on the floor, with two bottles of water and a bag of snacks on the table.

As Sergeants Koo and Hassan entered the room, Sergeant Koo said to Mr. Shuler, "Hey, man."  Mr. Shuler got off the floor, stretched, and sat in a chair across from Sergeant Koo at the interrogation table.  Sergeant Hassan sat in a chair set back from the table, close to the door, diagonally facing Mr. Shuler.  Sergeant Koo introduced himself and Sergeant

---

[5] The video recordings of Mr. Shuler's custodial statement were admitted as the State's Exhibits 45A and 45B.  As Sergeant Koo testified, and as the video footage confirms, State's Exhibits 45A and 45B both capture Mr. Shuler's custodial interrogation. The camera placement depicted by Exhibit 45A is over the door and inside the interrogation room, facing Mr. Shuler's left side.  It permits the viewer to see almost the entire interrogation room, Mr. Shuler, Sergeant Hassan, and Sergeant Koo.  By contrast, Exhibit 45B is an "overhead" camera.  Its focal point is the interview table, documents, and movements by Mr. Shuler or Sergeant Koo that enter the frame.

Hassan to Mr. Schuler, asked Mr. Schuler if he was alright, and inquired if there was anything he needed before beginning questioning. Sergeant Koo asked Mr. Shuler, "Are you good, man? You sure? You need to do anything before we start?" Mr. Shuler nodded his head in response to "are you good" and shook his head when asked if he needed do to do anything before they started.

Sergeant Koo then placed an Advice of Rights Form and a pen in front of Mr. Shuler and asked him to read his *Miranda* rights out loud from a form. After Mr. Schuler read each right, Sergeant Koo asked whether Mr. Shuler understood what he had just read and, if so, to indicate his acknowledgment by writing his initials next to the portion he had just read. Mr. Schuler acknowledged his understanding by nodding in response to Sergeant Koo's questions and initialing next to each right. The fourth and final item on the form included a waiver sentence—"I have been advised of my rights and I freely and voluntary waive my rights and agree to talk with police without having an attorney." Before initialing next to this item, Mr. Shuler asked, "Why can't I have an attorney talk with—" Sergeant Koo answered, "so like I said, it all applies. We want to talk to you. Like I said everything that you just read applies."

Sergeant Hassan then stated:

So—so basically at this point, right? You are under arrest. Right? So we have to read you your rights just to talk to you. Okay? So now that last line, just basically saying that you are agreeing to talk with us without an attorney present. Now, that doesn't say that—I mean, you can stop talking at any point or whatever. That's—you know that one of the statements up above, okay? You could—you could stop at any point. We—we won't ask any questions of you. But . . . You want to read it again?

11

After looking down at the Advice of Rights form for approximately 25 seconds, Mr. Shuler brought his pen to the paper and asked, "can I sign?" Before beginning the interrogation, Sergeant Koo confirmed that Mr. Shuler did not have any questions and asked him, "you good man?" Mr. Shuler responded, "cool."

Sergeant Koo began the questioning by asking Mr. Shuler basic information such as his name, date of birth, address, cell phone number, height, weight, and where he attended high school. Mr. Shuler provided all of that information. In addition, Mr. Shuler confirmed that he graduated from high school, that he was currently sober, and that he was not injured or hurt. Mr. Shuler gave his place of employment and advised that he worked Monday through Saturday.

After covering background information, Sergeant Hassan asked Mr. Shuler if he knew why he was arrested. Mr. Shuler shook his head negatively. Mr. Shuler recounted what he did on the date of his arrest. Mr. Shuler said that he had driven his Subaru to Giant, but he lets "friends" drive his car and "lend[s] [his] keys out when [h]e's at work because he do[esn't] drive it when he [goes] to work." After approximately ten minutes of questioning, Sergeant Hassan asked Mr. Shuler about the gun that police found in his car:

> [Sergeant Hassan:] Look man, we ain't—we ain't here to play no games, alright? So, we're just going to start a real conversation, all right?
>
> * * *
>
> All right, we're—we're both grown men here. Okay? We know that you knew what was underneath your driver's seat. Okay? It's your car. You're the only one who uses it. Okay? You know, I'm no—I'm not trying to be hard on you. I'm just saying let's cut the bull. Okay? So is it your gun?

12

Mr. Shuler responded, "I don't own any guns." In response to further questioning about the gun, Mr. Shuler stated that he didn't know how the gun got there. The detectives asked Mr. Shuler to recount his day again, and he stated that he woke up, went to work, came home, took a shower, changed his clothes, and went to Towson to get something to eat with a girl. When the detectives asked for the girl's name, Mr. Shuler said, "Can I get an attorney? I don't want to talk." The detectives ceased questioning Mr. Shuler and advised him that they would get him an attorney. Before leaving the room, the detectives confirmed that Mr. Shuler did not need anything such as water or the restroom.

### E. The Trial Court's Determination that the Evidence Did Not Generate the Voluntariness Instruction

Prior to the court instructing the jury, Mr. Shuler's counsel repeated his request for the court to give Maryland Criminal Pattern Jury Instruction 3:18 ("MPJI-Cr 3:18"),[6]

---

[6] The entirety of the Maryland Criminal Pattern Jury Instruction 3:18 ("MPJI-Cr-3:18") is as follows:

> You have heard evidence that the defendant made a statement to the police about the crime charged. [You must first determine whether the defendant made a statement. If you find that the defendant made a statement, then you must decide whether the State has proven] [The State must prove] beyond a reasonable doubt that the statement was voluntarily made. A voluntary statement is one that under all circumstances was given freely.
>
> [[To be voluntary, a statement must not have been compelled or obtained as a result of any force, promise, threat, inducement or offer of reward. If you decide that the police used [force] [a threat] [a promise or inducement] [an offer of reward] in obtaining defendant's statement, then you must find that the statement was involuntary and disregard it, unless the State has proven beyond a reasonable doubt that the [force] [threat] [promise or inducement] [offer of reward] did not, in any way, cause the defendant to make the

13

instructing the jury to determine the voluntariness of Mr. Shuler's statement, and the following colloquy ensued:

> [DEFENSE COUNSEL]: Thank you, Your Honor. We can discuss the Jury instructions. We covered some of that ground, but we could cover it as well here on the record. I would ask the Court to give statement to the Defendant, [MPJI-Cr] 3:18, with that.
>
> THE COURT: Say that again.

---

statement. If you do not exclude the statement for one of these reasons, you then must decide whether it was voluntary under the circumstances.]]

In deciding whether the statement was voluntary, consider all of the circumstances surrounding the statement, including:

(1)   the conversations, if any, between the police and the defendant;

(2)   [whether the defendant was advised of (pronoun) rights;]

(3)   the length of time that the defendant was questioned;

(4)   who was present;

(5)   the mental and physical condition of the defendant;

(6)   whether the defendant was subjected to force or threat of force by the police;

(7)   the age, background, experience, education, character, and intelligence of the defendant;

[(8)   whether the defendant was taken before a district court commissioner without unnecessary delay following arrest and, if not, whether that affected the voluntariness of the statement;]

(9)   any other circumstances surrounding the taking of the statement.

If you find beyond a reasonable doubt that the statement was voluntary, give it such weight as you believe it deserves. If you do not find beyond a reasonable doubt that the statement was voluntary, you must disregard it.

14

[DEFENSE COUNSEL]: I'm sorry, Your Honor. [MPJI-Cr] 3:18 is a statement of the Defendant suggesting that the Jury—and I agree that not the entire instruction would be appropriate but part of it is in this circumstance appropriate. I'd ask the Court to give that.

I understand that the State is suggesting the statement that was introduced, custodial statement of—made by Mr. Shuler taken by Detective Koo and other members of the police is offered for impeachment only, and with that, Your Honor, we'd submit. We do request [MPJI-Cr] 3:18 formally.

THE COURT: State, do you want to be heard?

[PROSECUTOR]: No, Your Honor.

THE COURT: Do you object?

[PROSECUTOR]: I object.

THE COURT: I do believe that based on the fact that the statement of the Defendant was presented during the State's rebuttal and the purpose of the rebuttal was because the Defendant did in fact testify that there was no motion prior. Again, I'm not faulting defense counsel for no motion, but the defense counsel acknowledged that the statement was a voluntary statement, is that correct, for the record? There's no pretrial motion, right? I'll strike right through that part.

[DEFENSE COUNSEL]: Right, the State had not intended to introduce the statement and she's the case-in-chief.

THE COURT: Correct, and so because of that, there is no pretrial motion, correct?

[DEFENSE COUNSEL]: Yes.

THE COURT: But this is a separate issue because the statement is not being offered as a statement against the Defendant but more of impeachment of the Defendant and the Court believes that it is not appropriate to use pattern instruction 3:18 over defense objection.

15

With respect to Mr. Shuler's prior statement, the court instructed the jury that it was admitted "only to help you decide whether to believe the testimony that [Mr. Shuler] gave during the trial." The court further instructed, "It is for you to decide whether to believe the trial testimony of Montay Shuler in whole or in part. You may not use the earlier statement for any purpose other than to assist you in making that decision."

## F. Conviction and Sentencing

The jury found Mr. Shuler guilty of two counts of voluntary manslaughter, one count of robbery with a dangerous weapon, two counts of using a firearm in the commission of a crime of violence, and one count of illegal possession of a firearm. The jury acquitted Mr. Shuler of first-degree murder, second-degree murder, and conspiracy to commit robbery with a dangerous weapon. The court sentenced Mr. Shuler to 70 years' imprisonment.

## G. Appellate Court of Maryland

Mr. Shuler timely appealed his conviction to the Appellate Court of Maryland. Among other things,[7] Mr. Shuler challenged the ruling of the trial court declining to give the instruction on the voluntariness of a defendant's statement, MPJI-Cr 3:18. The Appellate Court affirmed his conviction. *Shuler v. State*, 267 Md. App. 465 (2025).

---

[7] Mr. Shuler also made certain Fourth Amendment arguments, contending that the trial court should have suppressed evidence discovered as a result of his warrantless arrest and the seizure of his car because the police lacked probable cause. *Shuler v. State*, 267 Md. App. 465 (2025). The Appellate Court rejected Mr. Shuler's Fourth Amendment claims, and Mr. Shuler did not petition for this Court's review of those issues.

16

The Appellate Court gave three reasons for its conclusion that the trial court did not err in refusing to give the voluntariness instruction. First, the court reasoned, Mr. Shuler's "statement was not admitted to prove guilt[]" and "its use was limited to impeachment[.]" *Id.* at 508. Second, "even if the statement were considered for its substance," and not limited to impeachment purposes, the court stated that it was "exonerating" and was not a confession. *Id.* Third, the court held that even if the statement was a confession, Mr. Shuler failed to present "some evidence" that his statement was not voluntarily given. *Id.* The court noted that it was Mr. Shuler's burden to provide "some evidence" that his statement was not voluntarily given, and determined that his reliance on the fact that his statement occurred in custody, late at night, and by two police officers, did not satisfy that threshold. *Id.* at 509. Mr. Shuler filed a petition for writ of certiorari, which this Court granted. *Shuler v. State*, 493 Md. 168 (2026).

## II

### Standard of Review

In a criminal jury trial, the trial court "may, and at the request of a party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." Md. Rule 4-325(c). When a party requests an instruction on the law[8]—such as

---

[8] In *Hollins v. State*, we discussed an important nuance regarding the difference in the standard of review concerning a trial judge's failure to give an instruction on a question of law, which we review de novo, as opposed to a trial judge's failure to give an instruction related to facts and factual inferences, which is reviewed under an abuse of discretion standard. 489 Md. 296, 308–10 (2024). In this case, the voluntary statement instruction involves a question of law, and therefore, we conduct a de novo review of the legal question of whether the defendant produced "some evidence" to generate the instruction.

17

whether a criminal defendant's statement to the police was voluntary—a trial court is required to give a specific instruction to the jury when three conditions are met: (1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instructions actually given. *Jarvis v. State*, 487 Md. 548, 564 (2024). In this case, the parties agree on the first and third conditions. That is, Mr. Shuler's requested pattern jury instruction on voluntariness is a correct statement of law, and no other instruction addressed voluntariness. The only question is whether the instruction was applicable to the facts.

We conduct a de novo review of the second condition—whether the evidence was sufficient to generate the desired instruction. *Hollins v. State*, 489 Md. 296, 309 (2024); *see also Bazzle v. State*, 426 Md. 541, 550 (2012) ("The threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge." (quoting *Dishman v. State*, 352 Md. 279, 292–93 (1998))). "In assessing whether a particular jury instruction is applicable under the facts of a given case, a defendant must, as an initial matter, produce 'some evidence' sufficient to raise the jury issue." *Jarvis*, 487 Md. at 564 (citation modified). "In determining whether there was 'some evidence' to support the instruction, we review the evidence in the light most favorable to the accused." *Hollins*, 489 Md. at 309 (citing *Dykes v. State*, 319 Md. 206, 221–222 (1990)). As we explained in *Dykes*, the "some evidence" threshold is low. 319 Md. 216–17. "It calls for no more than what it says—'some,' as that word is understood in common, everyday usage." *Id.* "As long as the relied-upon evidence, if believed by a

18

rational juror, supports the proponent's claim, the proponent has met the burden of showing that the requested jury instruction applies to the facts of the case." *Hollins*, 489 Md. at 312 (citation omitted).

### III

### Discussion

Before this Court, Mr. Shuler argues that the circuit court erred in refusing to give the voluntariness instruction, and that the Appellate Court erred in affirming the circuit court's judgment. Mr. Shuler argues that two of the reasons for the Appellate Court's holding—that the voluntariness instruction was not required because the statement was introduced for impeachment purposes and was facially exculpatory—are inconsistent with this Court's case law. Mr. Shuler further contends that he produced "some evidence" to generate the voluntariness instruction.

For its part, the State concedes that, under this Court's case law, the voluntariness analysis applies to all custodial statements, including facially exculpatory ones, no matter how the State uses them at trial. The State asserts, however, that the Appellate Court correctly determined that Mr. Shuler failed to produce "some evidence" to generate the voluntariness instruction. The State further argues that even if the trial court erred in failing to give the instruction, any error was harmless beyond a reasonable doubt.

In considering the parties' arguments, it is instructive to discuss the applicable law that governs the admissibility of confessions, as well as the legal framework by which we consider whether "some evidence" has been produced to generate the voluntariness instruction.

19

### A. General Standard for Admissibility of a Confession

"Only voluntary confessions are admissible as evidence under Maryland law." *Hill v. State*, 418 Md. 62, 74 (2011) (quoting *Knight v. State*, 381 Md. 517, 531 (2004)). "A confession is admissible only if it is freely and voluntarily made and the defendant making the confession knew and understood what he or she was saying." *Hill*, 418 Md. at 74 (citation modified). "To be voluntary, a confession must satisfy federal and state constitutional strictures as well as the Maryland common law rule that a confession is involuntary if it is the product of an improper threat, promise, or inducement by the police." *Id.*

The voluntariness of a defendant's statement is evaluated under Maryland's "two-tiered approach" articulated in *Hof v. State*, 337 Md. 581, 604 (1995). The first step proceeds before the court and out of the presence of the jury, with the State bearing the burden of proving voluntariness by a preponderance of the evidence. *See Hillard v. State*, 286 Md. 145, 151 (1979); *see also State v. Kidd*, 281 Md. 31, 38 (1977) ("The federal constitutional test with respect to the judge's preliminary decision is that of a preponderance of the evidence[.]"). "Courts that are asked to determine at a suppression hearing whether a confession was made voluntarily must examine the totality of the circumstances affecting the interrogation and the confession." *Hill*, 418 Md. at 75 (citing *Knight*, 381 Md. at 532). If the court determines that the statement has been voluntarily given, the issue may proceed to the second tier—where it is submitted at trial to the jury, which "has the final determination, irrespective of the court's preliminary decision, whether or not the confession is voluntary, and whether it should be believed." *Hof*, 337

20

Md. at 604 (quoting *Dempsey v. State*, 277 Md. 134, 144 (1976)). The jury may use the statement in determining guilt, but only if the State persuades the jury of the voluntariness of the statement beyond a reasonable doubt. *Id.* at 606 (citing *State v. Kidd*, 281 Md. 32, 38 (1977)); *Hillard*, 286 Md. at 151. "It is, therefore, a bedrock principle of our jurisprudence that 'both the trial court and the jury must pass upon the voluntariness of a defendant's confession.'" *Zadeh v. State*, 258 Md. App. 547, 605 (2023) (quoting *Hof*, 337 Md. at 604).

## B. *Legal Framework for Voluntariness Instruction*

The narrow question before us in this case is whether the trial court erred in denying Mr. Shuler's request for the voluntariness instruction. The framework for our analysis is shaped by two overarching principles: (1) the jury (or factfinder) must determine the voluntariness of a defendant's statement to law enforcement if the issue is generated at trial; and (2) only "some evidence" of involuntariness is required to generate a voluntariness instruction. *See Hof*, 337 Md. at 620 (explaining the instruction is applicable only if "there is some evidence which supports the defendant's claim that his confession was involuntary").

There are two applicable legal frameworks for assessing the voluntariness of a defendant's statement to the police: Maryland common law, and federal and state due process requirements.

21

### 1. *Maryland's Common Law*

#### a. The Per Se Rule

At common law, a statement is involuntary per se "where 'it is the product of an improper threat, promise, or inducement by the police.'" *Madrid v. State*, 474 Md. 273, 317 (2021) (quoting *Lee v. State*, 418 Md. 136, 158 (2011)). That inquiry was first laid out by this Court in *Hillard v. State*, 286 Md. 145 (1979). Under the *Hillard* test, a statement is involuntary where "(1) any officer or agent of the police promises or implies to the suspect that he will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and (2) the suspect makes a confession in apparent reliance on the police officer's explicit or implicit inducement." *Lee*, 418 Md. at 161 (citing *Hillard*, 286 Md. at 153). The first prong of the *Hillard* test requires an objective analysis. That is, "the court must determine whether a reasonable person in the position of the accused would be moved to make an inculpatory statement upon hearing the officer's declaration; an accused's subjective belief that he will receive a benefit in exchange for a confession carries no weight under this prong." *Williams v. State*, 445 Md. 452, 478–79 (2015) (quoting *Hill*, 418 Md. at 76 (2011)).

*Hillard*'s two-pronged test applies when a court must determine whether a confession is the result of an improper inducement by law enforcement. *Hill*, 418 Md. at 76; *see also Winder v. State*, 362 Md. 275, 307–08 (2001) (explaining that "*Hillard* articulates the proper analysis where an accused alleges he [or she] was told that confessing would be to his [or her] advantage"); *Williams*, 445 Md. at 478 ("We look first to see if the police made a threat, promise, or inducement.").

b.  The Totality of the Circumstances Test

We have also adopted a common law totality of the circumstances test to determine whether a confession was made voluntarily.  *Hill*, 418 Md. at 75 (citing *Knight*, 381 Md. at 532).  As part of that analysis, we consider a non-exhaustive list of factors, including "the length of interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education, and experience of the suspect."  *Id.* (citing *Williams v. State*, 375 Md. 404, 429 (2003)); *see also Hof*, 337 Md. at 596–97 ("The 'totality of the circumstances' includes a number of factors, such as where the interrogation was conducted, its length, who was present, how it was conducted, its content, whether the defendant was given *Miranda* warnings, the mental and physical condition of the defendant, the age, background, experience, education, character, and intelligence of the defendant, when the defendant was taken before a court commissioner following arrest, and whether the defendant was physically mistreated, intimidated, or psychologically pressured." (citation modified)).

In *Hill*, we explained how the totality of the circumstances analysis and the per se rule intersect:

> Although a totality of the circumstances analysis is standard practice for determining whether an accused's statement to the police was voluntarily made, not all of the factors that bear on voluntariness are of equal weight; certain factors are "transcendent and decisive."  *Williams*, 375 Md. at 429.  Thus, "a confession that is preceded or accompanied by threats or a promise of advantage will be held involuntary, notwithstanding any other factors that may suggest voluntariness, unless the State can establish that such threats or promises in no way induced the confession."  *Knight*, 381 Md. at 533 (quoting *Williams*, 375 Md. at 429).

*Hill*, 418 Md. at 75–76.  In other words, the Maryland common law test looks to the "totality of the circumstances affecting the interrogation and confession[,]" *Hill*, 418 Md. at 75, but applies a per se rule of exclusion to statements that were "the product of an improper threat, promise, or inducement by the police." *Madrid*, 474 Md. at 317 (quoting *Lee*, 418 Md. at 158).

### 2. *Federal and State Constitutional Standard –Totality of the Circumstances*

The federal due process analysis, also referred to as the "constitutional voluntariness," or the "overborne will test," was described by the United States Supreme Court as

> an inquiry that examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession. [*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)].  The due process test takes into consideration "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." [*Id.*] The determination "depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein v. New York*, 346 U.S. 156, (1953).

*Dickerson v. United States*, 530 U.S. 428, 434 (2000) (citation modified).  Ultimately, some form of "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

In *Lee*, we held that the same "overborne will" test is applied to determine voluntariness under Article 22 of the Maryland Declaration of Rights.  418 Md. at 159; *see also Choi v. State*, 316 Md. 529, 535 n.3 (1989) (observing that Article 22 usually provides

the same protection against self-incrimination as the Fifth Amendment and identifying exceptions to that general rule).

"The primary difference between the federal constitutional test and the Maryland common law test is 'that constitutional voluntariness does not require that all promises, threats, or inducements render a confession involuntary; instead, the federal constitution requires only that courts consider promises, threats, or inducements as part of the totality of the circumstances that courts must look at to determine voluntariness.'" *Covel v. State*, 258 Md. App. 308, 326 (2023) (first quoting *Arizona v. Fulminante*, 499 U.S. 279, 285–86 (1991); then citing *Lee*, 418 Md. at 159–60).

## C. Case Law Discussing the Voluntariness Instruction

Both parties rely heavily on two Maryland cases discussing the voluntariness instruction—*Hof v. State*, 337 Md. 581 (1995) and *Zadeh v. State*, 258 Md. App. 547 (2023)—to support their respective arguments. Given the parties' reliance on these cases, it is instructive to discuss them in some detail.

### Hof v. State

In *Hof*, in connection with a defendant's custodial confession that had been admitted into evidence, this Court was asked to determine two questions: (1) whether the trial court's jury instruction regarding the State's obligation to comply with *Miranda* obviated the need for a nonconstitutional voluntariness instruction regarding the defendant's statement; and (2) whether the Appellate Court erred in holding that the defendant failed to present sufficient evidence to generate an instruction regarding the voluntariness of the confession. 337 Md. at 586.

These questions arose in the context of a criminal trial that resulted in the defendant's conviction for armed robbery and a related handgun offense. The State's evidence included a confession that he made during the custodial interrogation. Prior to trial, the defendant moved to suppress the confession, asserting that "it was involuntary under Maryland confession law, Article 22 of the Maryland Declaration of Rights, and the [Fifth] and [Fourteenth] Amendments to the United States Constitution." *Id.* at 586 (footnote omitted). "He also argued that it was given in violation of *Miranda*." *Id.*

The circumstances surrounding the confession included the following facts. The police held the defendant for two and one-half hours prior to questioning him. *Id.* at 587. Although the defendant was advised of his *Miranda* rights from a standard waiver form, he did not initial all the provisions on the form. *Id.* at 588. The defendant informed the detective of his extensive drug habit, and the detective was aware that the defendant used "all types of drugs[.]" *Id.* at 589. The defendant remained "shackled in leg irons throughout the interrogation[.]" *Id.* at 588. Although the detective testified that the defendant confessed to a robbery, the defendant refused to give a written statement. *Id.* at 589. After the police's questioning concluded, the defendant was taken to the hospital. *Id.*

At the pre-trial suppression hearing, the defendant testified that he was suffering from addiction, was experiencing withdrawal symptoms and nausea at the time of the interrogation, and that, after informing detectives of his physical state, was promised that he would be taken to the hospital after he gave a statement. *Id.* at 587–88.

The suppression court ruled that the defendant freely and voluntarily confessed. *Id.* at 588. The matter proceeded to trial. At trial, the defendant did not testify, but the State

successfully sought the admission of the defendant's custodial statement. *Id.* at 589. At the close of the evidence, defense counsel requested that the jury instructions be supplemented to include instructions concerning (1) whether the defendant properly waived his right to counsel under *Miranda*, and (2) whether the defendant's confession was voluntary. *Id.* at 589. Although the court agreed to "give the MPJI instruction" regarding the jury's role in determining the voluntariness of the confession, the court instead gave an instruction concerning only the admissibility of the confession based solely on compliance with *Miranda*. *Id.* at 589–91.[9] After the jury was instructed on the *Miranda* compliance,

---

[9] The court's jury instruction read as follows:

You've also heard evidence that the defendant confessed that he committed the crime with which he is charged or the crimes with which he is charged. You are instructed that you must be satisfied beyond a reasonable doubt that the defendant was clearly advised of each of his rights before making a confession while in custody and while undergoing interrogation; otherwise, you are to disregard the alleged confession.

The defendant must have been specifically advised that he has a right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney during any questioning and that, if he cannot afford an attorney, one will be appointed for him prior to any questioning, if he so desires.

You must be satisfied beyond a reasonable doubt that the defendant understood his rights and knowingly and willingly waived his rights prior to making a confession.

The fact that warnings were given does not automatically render a subsequent confession valid. The defendant must have knowingly and intelligently waived his rights. If such a waiver was not made, a confession made during custodial investigation is not a voluntary one. If you have a reasonable doubt as to whether the defendant was properly advised of his rights and waived or

27

defense counsel responded with a request for further instructions on the voluntariness requirement.[10] The trial judge declined to give defense counsel's requested voluntariness instruction, and the appeal ensued.

We agreed with the defendant that the *Miranda* instruction did not obviate the need for a voluntariness instruction. *Id.* at 600–03. We explained that compliance with *Miranda* is only one consideration in determining whether a confession was voluntarily made. *Id.*

---

> gave up those rights, then you must not consider the confession as part of the evidence in arriving at your verdict.
>
> And the burden is on the State to prove beyond a reasonable doubt that the alleged confession was freely and voluntarily made.
>
> Gentleman, that concludes my instructions.

*Hof v. State*, 337 Md. 581, 590–91 (1995).

[10] Specifically, in addition to being instructed that the statement complied with *Miranda*, defense counsel in *Hof* made the following request:

> I thank the Court for giving the instruction so far. I think the Court has to also advise the remaining aspect of the second prong; that they must determine beyond a reasonable doubt that the confession is voluntary, which under all the circumstances, is the product of a free and unconstrained will which has not been overborne or compelled.
>
> And tell them what they have to consider—the length of time the defendant was questioned, physical and mental condition, period of time that elapsed between being advised, other persons present at the time of making the alleged confessions, all the other circumstances surrounding including the age, background, education, experience, intelligence. And then say that the burden is on the State to prove beyond a reasonable doubt that the confession was freely and voluntarily made and without any threats, implied or direct, and that it's not voluntary if there's any inducement or promises of leniency, and unless this is done, that it must be disregarded.

*Id.* at 591.

at 600. Referencing the voluntariness instruction in the Maryland Pattern Jury Instructions, we explained that the voluntariness instruction requires the jury to consider a host of factors, including how long the defendant was in custody, his or her mental capacity, and as in this particular defendant's case, the extent to which he was under the influence of narcotics. *Id.* at 600 (citing MPJI-Cr 3:18 at 65–66). We stated that:

> A jury instruction focused primarily on whether there has been compliance with *Miranda* is insufficient as a voluntariness instruction. This is so because such an instruction does not provide the jury with guidance necessary to determine whether the confession was made voluntarily; it does not define "voluntary" or provide a meaningful explanation of the voluntariness standard. Indeed, it may even misdirect the jury's attention—by requiring the jury to look at only one of the elements of voluntariness, rather than the total picture.

*Id.* at 600–01. We, therefore, held that the instruction was "wholly inadequate" on the issue of the voluntariness of the confession. *Id.* at 602. In so holding, we observed that, "to the extent [the instruction] addresse[d] voluntariness at all, it focuse[d] on but one of the factors to be considered in the voluntariness equation" and totally failed "to address, and provide guidance to the jury as to, how the jury should assess whether the [defendant's] statement was voluntarily, i.e., given knowingly and willingly." *Id.* at 602.

After agreeing with the defendant that the *Miranda* instruction was insufficient as a matter of law to address the voluntariness of the confession, we further agreed with the State that the trial judge did not err in refusing to give the voluntary confession instruction because the issue of voluntariness was not generated by the evidence. After discussing the "two-tier[ed] approach" to the voluntariness question, which "allows for, jury reconsideration of the trial court's determination[,]" we clarified that the approach "does

29

not absolutely mandate that it occur." *Id.* at 617. We stated that to require that the jury be instructed on voluntariness consistent with the pattern instruction "as to each and every conceivable circumstance which might bear on voluntariness, when there is no supporting evidence, would be to instruct the jury on an abstract proposition of law and require it to speculate, practices that this Court has long rejected." *Id.* at 618. We thus explained that "even though the defendant may request a jury instruction on voluntariness, unless it has been generated by evidence, from whatever source, presented before the jury, the requested instruction need not be given." *Id.* at 618.

We observed that, at the pre-trial suppression hearing, the defendant testified that he was experiencing withdrawal symptoms and nausea at the time of his interrogation, and that, after informing detectives of his physical state, he was promised that he would be taken to the hospital after he gave a statement. *Id.* at 619. By contrast, the defendant did not present such evidence at trial. *Id.*

Turning to the evidence presented to the jury, we explained that, although the defendant's extensive drug habit was presented to the jury, and there was testimony that the defendant was taken to the hospital after the interrogation, there was no evidence presented to the jury concerning the defendant's state of mind at the time his statement was taken. *Id.* at 618–19. We stated that "[t]he critical focus in an involuntariness inquiry is the defendant's state of mind. Whether the defendant's incriminating statement was made voluntarily or involuntarily must depend upon that defendant's mental state at the time the statement was made." *Id.* at 619. "That question," we observed, "which is one of fact and

30

subjective in nature, must be determined by a consideration of a defendant's acts, conduct, and words." *Id.* (citation modified).

We concluded, based upon our review of the record, that the defendant had failed to generate some evidence that his confession was involuntary. *Id.* at 620–21. Although there was evidence that the defendant had a "drug habit"—and indeed, a "severe one"— we stated that there was "nothing, other than this fact, in this record to suggest that there was any nexus between his habit and his confession." *Id*. at 620. Having determined that the "voluntariness of the confession" was not generated at trial, we concluded that the *Miranda* compliance jury instruction that was given was sufficient. *Id.* at 621.

### Zadeh v. State

In *Zadeh v. State*, the Appellate Court concluded that "some evidence" supported giving a voluntariness instruction and, thus, reversed the defendant's conviction and remanded the case for a new trial based upon the trial court's failure to give a voluntariness instruction. 258 Md. App. 547 (2023). In that case, the defendant made several inculpatory statements, which he moved to suppress. *Id.* at 603. The defendant told the police that he had previously been beaten by the police, was scared of the police, did not trust the police, and was only talking because "if [he] didn't, it makes it look like [he] did something." *Id.* at 607. The circuit court denied his motion to suppress. *Id.* at 608.

Applying the "some evidence" test to the totality of the circumstances presented at trial, the Appellate Court concluded that there was "some evidence" from which a jury could infer that the defendant's statements were not freely and voluntarily given: (1) the defendant was "subjected to a lengthy interview . . . by two law enforcement officers who

31

repeatedly asked him pointed questions, caught him in lies, and confronted him with evidence[]"; (2) the defendant "was not Mirandized and his request for a lawyer was ignored[]"; and (3) the defendant "repeatedly expressed his past traumatic experience with law enforcement and his fear of speaking with police officers or being met with a violent response." *Id.* at 618–19.

### D. The "Voluntariness Requirement" Applies to Prior Statements Regardless of Whether They Are Offered for Impeachment, Or Are Facially Exculpatory

We agree with Mr. Shuler's first contention that the voluntariness requirement applies even if the statement is offered for impeachment purposes and where it is facially exculpatory. In rejecting Mr. Shuler's request for a jury instruction, the Appellate Court relied on two rationales. First, it reasoned that the instruction was unnecessary because Mr. Shuler's prior statement was offered for "impeachment" and not "to prove guilt." *Shuler*, 267 Md. App. at 508. Second, it concluded that the statement fell outside of the scope of the instruction because it was neither "a confession" nor "incriminating," but was instead "exonerating." *Id.* The State does not defend either rationale before this Court, and we agree that both are incorrect as a matter of law.

In *Brittingham v. State*, 306 Md. 654 (1986), we considered the question of whether the jury must decide "voluntariness" where a defendant's prior statement is offered for "impeachment purposes" only and where the trial judge already determined that the statement was admissible. *Id.* at 660. We held that the jury must determine voluntariness regardless of whether a statement "is offered to impeach . . . [or] offered in the State's case in chief." *Id.* at 664. In subsequent cases, we have reaffirmed that the jury must determine

32

the voluntariness of statements used to impeach. *See, e.g., Hof*, 337 Md. at 599–600 ("The admissibility of a defendant's statement whether, as factual matter, in the State's case in chief or, as a prophylactic matter, to impeach the defendant, depends on whether it was made freely, knowingly, and without coercion or inducement." (citation modified) (citing *Brittingham*, 306 Md. at 664)).

Similarly, the State does not argue that the Appellate Court correctly held that the voluntariness instruction is appropriate only where the statement at issue is a "confession." In *Stewart v. State*, 232 Md. 318 (1963), we expressly rejected the view that "confessions" are admissions that are subject to different voluntariness rules. *Id.* at 323. We denied any distinction, reasoning that all "significantly incriminating" statements must "have been made voluntarily and without improper inducement to be evidence against the accused." *Id.*

In *Green v. State*, 236 Md. 334 (1964), we confirmed that even "exculpatory" statements must "have been made voluntarily to [be] admissible." *Id.* at 338–39. In that case, the defendant faced charges for raping a woman and murdering her husband. *Id.* at 337. The defendant told police that the wife had "enticed him into the house with an offer of sexual relations" and that he killed the husband in self-defense after he was surprised. *Id.* at 338. Although the defendant made statements to "exculpat[e] himself" and the statements were "more exculpatory than otherwise," we concluded that "the voluntariness of the statements control[led] their admissibility." *Id.* at 338–39. We have applied the voluntariness analysis to other exculpatory statements—including "essentially exculpatory" denials. *See, e.g.*, *McIntyre v. State*, 309 Md. 607, 611 (1987) (applying the

33

voluntariness analysis to defendant's statement in which he "denied having committed the rape").

Moreover, our case law has recognized for "decades" that "false exculpatory" statements are highly incriminating because they "permit[] the inference that the party [lied] because he knew that his cause should not prevail." *See Grimm v. State*, 447 Md. 482, 511 (2016); *accord Burns v. State*, 149 Md. App. 526, 547 (2003) ("palpably false exculpatory testimony [is] strong evidence of a consciousness of guilt"); *Hricko v. State*, 134 Md. App. 218, 242 (2000) ("It is a forensic fact of life that an exculpatory effort that is disbelieved thereby becomes highly inculpatory."). Indeed, the United States Supreme Court has rejected the distinction between "inculpatory" and "exculpatory" statements, observing that if "a statement were in fact truly exculpatory it would, of course, never be used by the prosecution." *Miranda v. Arizona*, 384 U.S. 436, 476–77 (1966). In short, statements "intended to be exculpatory by the defendant," when introduced by the prosecution, are "incriminating in any meaningful sense of the word." *Id.*; s*ee also* Md. Rule 4-252(a)(4) (providing the "procedural requirements" for contesting voluntariness in a pre-trial motion to suppress, which applies to "any unlawfully obtained admission, statement, or confession"). Nor does the voluntariness inquiry turn on whether a defendant's statement is facially inculpatory. *Zadeh v. State*, 258 Md. App. 547, 613 n.20 (2023) (noting that voluntariness is not limited to confessions or inculpatory statements).

In short, we reaffirm our existing case law and reject the notion that a different procedure for adjudicating voluntariness applies simply because a statement was offered to impeach or was facially exculpatory.

### E. *Mr. Shuler Failed to Present "Some Evidence" That His Custodial Statement Was Not Voluntary*

Turning to the evidence presented in this case, we determine that Mr. Shuler failed to present "some evidence" that his custodial statement was not voluntary under either the federal and state constitutional test, or Maryland's common law totality of the circumstances test.

As an initial matter, we note that Mr. Shuler does not contend that his statement was involuntary because it was the product of an improper threat, promise or inducement by police. Accordingly, Mr. Shuler's statement does not trigger the *Hillard* involuntary per se analysis under Maryland's common law.

Nor does Mr. Shuler appear to argue that his statement was the result of coercive police conduct. As discussed above, under the constitutional test for voluntariness, some form of "coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado*, 479 U.S. at 167. "Not every deceptive practice by the police meets this standard. . . . Indeed it is the rare and extreme case in which a court will find that a suspect confessed involuntarily." *Lee*, 418 Md. at 159 (citation omitted).

A review of the video recording plainly shows that the detectives did not engage in any coercive conduct. After the detectives entered the room, they remained seated during the entire 15-minute interview. They did not raise their voices or threaten Mr. Shuler. They did not make any promises or inducements to Mr. Shuler to entice him to make a statement.

Mr. Shuler argues that under the totality of the circumstances, he was uniquely susceptible to police pressure because he was questioned in custody by two officers late at night after being in police custody for hours. We rejected a similar argument in *Hof*—a case in which the facts showed a more restrictive detention for questioning of a more vulnerable adult than Mr. Shuler's circumstances presented. In *Hof*, the defendant (1) was in custody for two and one-half hours prior to questioning; (2) remained in shackles throughout the interrogation; (3) informed the detective that he had an extensive drug habit; (4) was transported to the hospital after confessing; and (5) refused to give a written statement despite the detective's testimony that the defendant confessed to a robbery.

Here, there is no evidence to show that Mr. Shuler's statement to the police was involuntary. The detectives advised Mr. Shuler of his *Miranda* rights at the outset of the interview, had him read each right aloud, and initial each statement. When he was finished, he signed the agreement. Unlike the defendants in *Hof* and *Zadeh*, Mr. Shuler did not contend that his *Miranda* rights were violated. Indeed, at trial, when the trial court inquired whether counsel contended the statement was involuntary, counsel responded: "we don't have a *Miranda* issue, and again, I don't think there's a voluntariness issue."

Mr. Shuler contends on appeal that his statement was involuntary because the questioning started after he initially asked, during his reading of the *Miranda* rights, "Why can't I have an attorney talk with—", but the video recording makes clear that Mr. Shuler's question was about the meaning of the *Miranda* advisements, not a request for counsel. The detectives responded by correctly explaining the law, stating that the "last line [of the *Miranda* advisements] just basically is saying that you are agreeing to talk with us without

36

an attorney present[,]" but "you can stop talking at any point," and "[w]e won't ask any questions after that." When asked whether he "want[ed] to read it again[,]"—referring to the *Miranda* advisements, Mr. Shuler looked down at the form for approximately 25 seconds, answered, "Can I sign?" and proceeded to do so and to answer questions, without saying that he wanted an attorney present. When, 15 minutes into the interrogation, Mr. Shuler said that he wanted a lawyer, the questioning was stopped.

As in *Hof*, Mr. Shuler presented no evidence as to his state of mind at the time that the statement was made. Mr. Shuler did not testify to any circumstance that prompted his statement. Notably, Mr. Shuler was not asked by his attorney about any of the circumstances of his interrogation, or about why he spoke to the police at all. He was only asked, "why didn't you tell the police what happened when Detective Koo talked to you?" He responded that "I didn't tell [officers about acting in self-defense] because I felt like I was going to get charged for murder and me telling them that I just killed someone in self-defense … I never would have gotten a chance for self-defense or no type of bail, anything, so I just told them that I didn't know anything about it."

Critically, Mr. Shuler did not testify that he felt *compelled* to speak—instead, he testified about *why* he was untruthful about not being involved, as opposed to giving his self-defense account of the events to which he testified at trial. His testimony mentioned no circumstances that would allow a reasonable factfinder to find that his will was overborne such that his statement was involuntary. Far from it: Mr. Shuler's testimony indicated that he made a deliberate, strategic decision about what to tell the police about the incident.

Mr. Shuler attempts to distinguish *Hof* on the basis that in that case, the jury was given an instruction on *Miranda*. According to Mr. Shuler, the question in *Hof* was whether the voluntariness instruction was adequate, not whether the court needed to give an instruction at all. We disagree that *Hof* is distinguishable on that basis. We agree with Mr. Shuler that his case is procedurally different in that *Hof* involved an allegation that the police did not comply with *Miranda* and no such assertion was made here. But in *Hof*, we specifically held that the *Miranda* instruction that was given was insufficient as a matter of law on the issue of the voluntariness of the confession and proceeded to consider whether there was "some evidence" presented to generate the voluntariness instruction. Where *Hof* and Mr. Shuler's case overlap is the lack of evidence supporting the voluntariness instruction that they both requested. In *Hof*, after concluding that the *Miranda* instruction was insufficient to address the question of voluntariness, we proceeded to undertake an examination of the evidence to assess whether the instruction was generated. We determined that the facts did not support an instruction on voluntariness. As discussed above, Mr. Shuler presents even less compelling facts in this case.

Mr. Shuler also argues that the "some evidence" standard was met because he gave his statement "uncounseled," late at night, and that he "appears tired, dazed and confused" in the video of the interview. As discussed above, Mr. Shuler does not argue, nor can he successfully establish, that he did not receive a proper explanation of his rights under *Miranda*. That he spoke to the police uncounseled after properly receiving his *Miranda* rights is a factor that weighs toward voluntariness of the statement. *Hof*, 337 Md. at 596. Notably, when Mr. Shuler eventually stated, "Can I get an attorney? I don't want to talk no

38

more," the detectives immediately ceased substantive questioning and honored his request. Their prompt termination of the interview strongly demonstrates the absence of coercive police conduct.

Additionally, Mr. Shuler's argument that he "appears tired, dazed and confused" is not supported by the record. The detectives asked Mr. Shuler if (1) he needed anything before they began to question him, (2) he was hurt or injured, and (3) he was sober (and Mr. Shuler confirmed that he was sober), (4) he could read, (5) he had graduated from high school. He confirmed that he could read and that he had graduated from high school. Nothing in the record or in Mr. Shuler's testimony lends itself to an inference that he was dazed and confused when the police questioned him.

Viewing additional factors that might "bear on the voluntariness of a confession[,]" *Williams*, 375 Md. at 429, Mr. Shuler was questioned by two officers. The officers, both of whom remained seated during the interview, did not raise their voices, did not offer him any promises or inducements to confess or provide a statement, and did not threaten him in any manner. The questioning occurred approximately four hours after his arrest. Mr. Shuler was an employed 22-year-old high school graduate, and he was sober and unharmed. Mr. Shuler fails to identify any facts that weighed against the voluntariness of his statement at all, let alone facts that would meet the threshold of "some evidence" to generate a jury instruction. He was also very alert and astute. When the officer asked him what he did "yesterday," he replied, "I just told you." The officer responded that he only told him what he did "today", to which Mr. Shuler reminded him that it was after midnight, so that was "yesterday."

Nor are we persuaded by Mr. Shuler's reliance on *Zadeh*. There are key differences between that case and Mr. Shuler's case. The evidence in *Zadeh* supported that the defendant's fear of police and prior experience as a victim of police brutality could have allowed a jury to infer that his interrogation was coercive. As discussed above, the Appellate Court noted that Mr. Zadeh "was subjected to a lengthy interview . . . by two law enforcement officers who repeatedly asked him pointed questions, caught him in lies, and confronted him with contradictory evidence." 258 Md. App. at 618–19. He "was not Mirandized and his request for a lawyer was ignored." *Id.* at 619. He "repeatedly expressed his past traumatic experiences with law enforcement and his fear of speaking with police officers or being met with a violent response." *Id.*

The Appellate Court held that "[t]he evidence at trial … established Mr. Zadeh's background and experiences are such that the intense questioning of him as a suspect was coercive under the circumstances." *Id.* at 609. The evidence in that case further established that "Mr. Zadeh clearly felt compelled to speak with police, for fear of physical abuse were he to refuse, and even told the police that he was scared to answer their questions" based on violent "encounters with the police[.]" *Id.* at 606, 610. On that record, the Appellate Court concluded that there was enough evidence presented at trial to warrant a voluntariness instruction. *Id.* at 620.

The facts of Mr. Shuler's custodial statement are very different. He was Mirandized, his interview was approximately 15 minutes long, he was not asked repeated pointed questions, and he made no statement nor gave any testimony to the effect that he feared police or was the victim of police brutality. With respect to Mr. Shuler's argument

40

that he requested counsel but was ignored, the interview makes clear that Mr. Shuler's question about having a lawyer was related to the meaning of his *Miranda* rights, and when officers clarified his rights, he asked only "can I sign?" and did not make any request for an attorney until about fifteen minutes after his *Miranda* waiver—at which point the detectives immediately stopped the interview.

In a footnote in his brief, Mr. Shuler directs us to language in the *Zadeh* opinion to support a "categorical rule" always requiring an instruction that a jury must find a defendant's statements to be voluntary beyond a reasonable doubt before considering them. *Zadeh*, 258 Md. App. at 616 n.23. In *Zadeh*, the Appellate Court stated that "[t]he *Hof* decision implies that a defendant may *always* be entitled to at least a limited instruction apprising the jury that they may find a defendant's statements voluntary beyond a reasonable doubt." *Id.* In support of this assertion, the Appellate Court cited our holding that "to merit a jury instruction on voluntariness, *one that does more than advise the jury that the State must prove voluntariness* . . . the issue must be generate before the jury." *Id.* (quoting *Hof*, 337 Md. at 617). The Appellate Court also pointed to language in *Hof* in which we stated that the instruction that the court "actually gave, requiring the jury to find the statement voluntary beyond a reasonable doubt, was sufficient." *Id.* (quoting *Hof*, 337 Md. at 621).

We disagree with the notion that *Hof* supports a categorical rule. First, after concluding that the *Miranda* instruction that was given was insufficient as a matter of law to instruct the jury on voluntariness, we proceeded to undertake an analysis to determine whether there was "some evidence" to generate the instruction. Second, a categorical rule

41

would conflict with this Court's longstanding jurisprudence on jury instructions: an instruction on a legal principle or issue ordinarily must be given when the legal principle is "applicable to the facts of the case," *i.e.*, when there is "some evidence" to generate it. *Dickey v. State*, 404 Md. 187, 197–98 (2008); *Blackwell v. State*, 278 Md. 466, 477 (1976). If this Court intended to create a categorical rule requiring a voluntariness instruction any time a defendant's prior custodial statement was admitted into evidence, we would have said so. Finally, we note that our jurisprudence, which requires that there be "some evidence" to generate a jury instruction, even in the context of whether a custodial statement was voluntary, is consistent with that of other states.[11]

In summary, in the absence of any testimony from which a reasonable factfinder could infer that Mr. Shuler's will was overborne, or he was coerced into making a statement, nothing about the facts that Mr. Shuler relies upon—that he was questioned late at night without counsel by two detectives—meets the threshold of "some evidence" to

---

[11] In Massachusetts, the pattern jury instruction on voluntariness of a defendant's statement is called the humane practice instruction. "A 'humane practice' instruction is required where a defendant's statements are offered in evidence, and the voluntariness of those statements is a 'live issue at trial.'" *Commonwealth. v. Carter*, 58 N.E.3d 318, 329 (Mass. 2016) (quoting *Com. v. Tavares*, 430 N.E.2d 1198, 1205 (Mass. 1982)). Massachusetts jurisprudence is particularly instructive because we adopted the requirement that the issue of voluntariness is to be decided by the jury from the equivalent "Massachusetts rule." *See Brittingham v. State*, 306 Md. 654, 662–65 (1986) (discussing the origins of Maryland practice as "the Massachusetts rule"). New York follows a similar rule: "A trial judge is required to charge on voluntariness only if any issue has been raised at the trial by proper objection, and evidence sufficient to raise a factual dispute has been adduced by either direct or cross-examination." *People v. Cefaro*, 244 N.E.2d 42, 46 (N.Y. 1968). In *Cefaro*, the Court of Appeals of New York noted that "voluntariness was not put in issue in any manner and, if the judge would have charged the jury on voluntariness, they would in effect have been asked to make a factual determination when no evidence was adduced as to voluntariness."

warrant giving the instruction. As we explained in *Hof*, to give MPJI-Cr 3:18 in this situation, instructing the jury "as to each and every conceivable circumstance which might bear on voluntariness, when there is no supporting evidence," would be to "instruct the jury on an abstract proposition of law and require the jury to speculate, practices that this Court has long rejected." 337 Md. at 618. The evidence did not support MPJI-Cr 3:18, and the trial court correctly declined to give it.

### F. Even If Mr. Shuler Had Presented "Some Evidence" to Generate the Voluntariness Instruction, The Trial Court's Failure to Give the Instruction Was Harmless

Finally, even assuming Mr. Shuler presented sufficient evidence to require a voluntariness instruction under Maryland Pattern Jury Instruction 3:18, any error in failing to give that instruction was harmless beyond a reasonable doubt. *See, e.g.*, *State v. Elzey*, 472 Md. 84, 126 (2021) (reviewing error in jury instruction for harmless error); *Tucker v. State*, 407 Md. 368, 382 (2009) (same). An error is harmless and, therefore, not reversible if the "reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Tucker*, 407 Md. at 383 (citation modified).

In this case, had the jury been instructed on voluntariness and concluded that there was a reasonable doubt whether Mr. Shuler's statement to the detectives was voluntary, the jury would have been required to disregard the statement in reaching its verdict. *See* MPJI-CR 3:18 ("If you do not find beyond a reasonable doubt that the statement was voluntary, you must disregard it."). Under these circumstances, however, where the statement was offered as impeachment, and where Mr. Shuler testified that he shot both of the victims, it is undisputed

43

that his original statement to the police was untruthful. In fact, Mr. Shuler testified and explained why he had been untruthful—he did not want to be charged with murder.

We agree with the State that any alleged error in failing to give MPJI-CR-3:18 was harmless in light of the jury's verdict. The jury acquitted Mr. Shuler of all the murder charges, and convicted him of two counts of voluntary manslaughter, which suggests that, notwithstanding Mr. Shuler's impeachment with his prior statement, the jury *credited* Mr. Shuler's testimony about self-defense. Mr. Shuler's counsel repeatedly called for such a verdict in his closing argument.

In his closing argument, counsel argued to the jury that "even if [Mr. Shuler's] belief was unreasonable, that is still not first-degree murder, it's not second-degree murder, it's manslaughter[.]" Counsel also told the jury that if his client "actually believed he was in immediate or imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, that is partial self-defense and your verdict should be guilty of manslaughter and not murder, not murder." Although the jury was instructed on both perfect self-defense and imperfect self-defense, aside from mentioning types of self-defense in closing and requesting that the jury acquit his client of all charges,[12] Mr.

---

[12] Maryland recognizes two varieties of self-defense—perfect self-defense and imperfect self-defense. *Jarvis v. State*, 487 Md. 548, 555 (2024); *State v. Smullen*, 380 Md. 233, 251 (2004). Perfect self-defense requires the following:

(1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

44

Shuler's counsel did not argue that Mr. Shuler's belief that he was in imminent danger of death or serious bodily harm was objectively reasonable, such that it would have justified perfect self-defense and an acquittal. Moreover, even if he had, we determine that the error still would have been harmless beyond a reasonable doubt. Assuming the trial court had given the voluntariness instruction, the jury would have been instructed to disregard a custodial statement in which Mr. Shuler denied any involvement that was used entirely for impeachment purposes. There is no nexus between the impeachment statement—in which Mr. Shuler denied any involvement—and whether Mr. Shuler's belief that he was in immediate danger of death or serious bodily harm was objectively reasonable.[13]

---

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must not have been unreasonable and excessive, that is, the force must not have been more than the exigency demanded.

*Jarvis*, 487 Md. at 555. Perfect self-defense is a total defense to murder, and all lesser included offenses, and if accepted by a trier of fact, necessitates and acquittal. *Id.* By contrast, imperfect self-defense "arises when the actual, subjective belief on the part of the defendant that he or she is in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force, is not an objectively reasonable belief. What may be unreasonable is the perception of imminent danger or the belief that the force employed is necessary to meet the danger, or both." *Smullen*, 380 Md. at 252 (citation modified). Unlike perfect self-defense, imperfect self-defense does not constitute a justification for the killing and does not warrant an acquittal. *Id.* "Its only effect is to negate the element of malice required for a conviction of murder and thus reduces the offense to manslaughter." *Id.*

[13] Mr. Shuler's custodial statement also had no bearing on his robbery and conspiracy convictions. Had the jury been given the voluntariness instruction and disregarded Mr. Shuler's prior inconsistent statement in which he denied any involvement, it would have no nexus to the robbery and conspiracy convictions. Moreover, there was overwhelming evidence that supported the convictions—the firearm registered to Mr. Palmer recovered from Mr. Shuler's vehicle, bearing his fingerprints; the cell location data

In *Gonzalez v. State*, 487 Md. 136, 184–89 (2024), we considered a harmless error analysis in a similar context. There, the error related to preclusion of evidence about a witness's U visa application—a fact that we determined could have motivated the witness to testify favorably for the State. *Id.* at 180. We found that the error was harmless because the defendant testified and "acknowledged committing acts that constituted second-degree assault[.]" *Id.* at 186. We further noted that the jury "acquitted [the defendant] of the two more serious offenses that involved conduct that he did not acknowledge having engaged in." *Id.* at 187. Likewise, here, Mr. Shuler admitted to shooting Mr. Palmer and Mr. Stewart. And like the defendant in *Gonzalez*, he was only convicted of the less serious offense of voluntary manslaughter, which his testimony supported.

Furthermore, the trial court instructed the jury as to its role in determining the credibility of the witnesses.[14] The court also gave an appropriate limiting instruction as to Mr. Shuler's prior recorded statement:

---

placing him at the scene; Mr. Griffin's marijuana; and Mr. Palmer's text messages, arranging the drug transaction. Likewise, the conviction for illegal possession of a regulated firearm turned entirely on the physical evidence and Mr. Shuler's prior conviction history. Had the jury been given the voluntariness instruction, found beyond a reasonable doubt that the instruction was not voluntary and disregarded it, such a decision would not have had any effect on the robbery and conspiracy convictions.

[14] The court instructed the jury as to the credibility of the witnesses as follows:

> You are the sole judge on whether a Witness should be believed. In making this decision, you may apply your own common sense and life experiences. In deciding whether a witness should be believed, you should carefully consider all of the testimony and evidence as well as whether the Witness's testimony was affected by other factors.

You've heard testimony that Montay Shuler made a statement before trial. Testimony concerning that statement was permitted only to help you decide whether to believe the testimony that the Witness gave during this trial.

It is for you to decide whether to believe the trial testimony of Montay Shuler in whole or in part. You may not use the earlier statement for any purpose other than to assist you in making that decision.

The court's instructions as to witness credibility determinations, and the limited use of Mr. Shuler's statement as impeachment only, particularly when he admitted that he made the false statement, and explained why, rendered the court's failure to give a voluntariness instruction harmless.

Mr. Shuler's exculpatory statement in which he denied any involvement in the shootings, which was admitted for impeachment purposes only, and when he acknowledged in his testimony that he lied when he was interviewed by the police, did nothing to affirmatively establish his guilt. Moreover, his guilt was established by ample other evidence. Even if the jury had decided not to consider Mr. Shuler's statement of denial, the jury had all of the other evidence before it, including the victim's handgun that

---

You should consider such other factors as: the Witness's behavior on the stand and the manner of testifying, whether the Witness appeared to be telling the truth, the Witness's opportunity to see or hear the things about which testimony was given, the accuracy of the Witness's memory, whether the Witness has a motive not to tell the truth, whether the Witness has an interest in the outcome of the case, whether the Witness's testimony was consistent, whether other evidence that you believe supported or contradicted the Witness's testimony, whether, and the extent to which the Witness's testimony in Court differed from the statements made by the Witness on any previous occasion, and whether the Witness has a bias or prejudice.

You are the sole judge of whether a Witness should be believed. You need not believe any Witness even if the testimony is uncontradicted. You may believe all, part, or none of the testimony of any Witness.

47

was found in Mr. Shuler's vehicle, the jail call where he admits to "an and one" and discusses prices for the gun, and his own testimony in which he explains that he lied to police and admits to shooting both Mr. Palmer and Mr. Stewart. We therefore conclude that even if the trial court erred in not giving Mr. Shuler's requested instruction on voluntariness, any error was harmless.

## IV

## Conclusion

For the foregoing reasons, we hold that Mr. Shuler failed to provide "some evidence" to generate his requested instruction on voluntariness, and the trial court did not err in refusing to give it under the facts of this case. We further hold that, even if the trial court had erred in refusing to give the instruction, any error in not giving Mr. Shuler's instruction on voluntariness was harmless. We affirm the judgment of the Appellate Court.

**JUDGMENT OF THE APPELLATE COURT AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

IN THE SUPREME COURT

OF MARYLAND

No. 57

September Term, 2025

_____

MONTAY D. SHULER

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Concurring and Dissenting Opinion by Watts, J.

_____

Filed: July 20, 2026

Respectfully, I concur in part and dissent in part. I concur in the Majority's holding that, before the State may use a defendant's out-of-court statement for impeachment purposes, it must first establish that the statement was voluntary. See Maj. Slip Op. at 32-34. The use of a statement at trial for impeachment purposes does not eliminate the requirement that the statement have been voluntarily made. A statement denying guilt, or otherwise tending to exculpate the defendant, may still be the product of improper threat, promise, or inducement by the police or coercion. Accordingly, I agree that the State's proposed use of Mr. Shuler's statement for impeachment did not eliminate the requirement that the statement be voluntary.

I respectfully dissent from the Majority's holding that Mr. Shuler failed to generate "some evidence" to support the giving of an instruction on voluntariness and that the trial court did not err in refusing to give the instruction. See Maj. Slip Op. at 35, 42-43. In my view, Mr. Shuler was entitled to an instruction on voluntariness because the "some evidence" standard was satisfied. The question as to whether a voluntariness instruction should be given is not whether the jury would ultimately find that the statement was not voluntary beyond a reasonable doubt, or whether the State has strong evidence of voluntariness, or whether the trial court has already found the statement to be voluntary. The question is whether there is enough evidence, when viewed in the light most favorable to the defendant, from which a reasonable jury could have some hesitation about whether the statement was freely and voluntarily made. See Bazzle v. State, 426 Md. 541, 551, 45 A.3d 166, 171-72 (2012) ("[T]he threshold is low, as a defendant needs only to produce 'some evidence' that supports the requested instruction. . . . Furthermore, in evaluating

whether competent evidence exists to generate the requested instruction, we view the evidence in the light most favorable to the accused." (Citation modified)). The source of the evidence does not matter; if there is some evidence which, if credited by the jury, would support the defendant's position, the defendant has met the burden. See id. at 551, 45 A.3d at 171-72. In this case, that low threshold was met.

While in custody, as the Miranda advisement was given to him, Mr. Shuler asked: "Why can't -- I have an attorney talk with --?" This question is one that a rational juror could reasonably have found to be a request for a lawyer. The Majority determines that the question was a generic request for clarification of the meaning of the Miranda form. See Maj. Slip Op. at 36-37. But, the Majority is not the factfinder and its determination violates the principle that appellate courts do not engage in factfinding. See, e.g., Polk v. State, 378 Md. 1, 8, 835 A.2d 575, 579 (2003) ("When we perform an independent constitutional review, we do not engage in *de novo* fact-finding." (Citation modified)). Nonetheless, the Majority finds: "With respect to Mr. Shuler's argument that he requested counsel but was ignored, the interview makes clear that Mr. Shuler's question about having a lawyer was related to the meaning of his *Miranda* rights[.]" Maj. Slip Op. at 40-41. In making this finding, the Majority engages in factfinding and usurps the role of the jury.

Mr. Shuler's question could obviously have been found to be a question from a defendant asking to have an attorney speak with him before proceeding with the advice of rights. A rational juror easily could have found Mr. Shuler's question to be a request for an attorney during the advisement of rights that was cut off by Sgt. Koo, who interrupted Mr. Shuler stating, "so like I said, it all applies. We want to talk to you. Like I said

everything that you just read applies." Sgt. Koo did not respond by confirming that Mr. Shuler could have counsel, asking whether he wanted counsel, or stopping the interrogation. Instead, Sgt. Koo advised Mr. Shuler that the officers wanted to talk to him and that everything he read applies. After that, Sgt. Hassan stated: "So—so basically at this point, right? You are under arrest. Right? So we have to read you your rights just to talk to you. Okay? So now that last line, just basically saying that you are agreeing to talk with us without an attorney present." Regardless of whether Mr. Shuler's request is viewed as an unambiguous request for counsel or as a question subject to different interpretations, under the "some evidence" standard, viewed in the light most favorable to Mr. Shuler as it must be, Mr. Shuler's request and the response of the officers, brushing the request aside, were sufficient to generate an instruction on voluntariness. See Bazzle, 426 Md. at 551, 45 A.3d at 171-72 ("[I]n evaluating whether competent evidence exists to generate the requested instruction," *i.e.*, whether there is "some evidence" that supports the requested instruction, "we view the evidence in the light most favorable to the accused." (Citation modified)).

That a jury could find that Mr. Shuler's initial question was a request for an attorney is strengthened by what happened during the interrogation shortly thereafter. During questioning, Mr. Shuler expressly stated that he wanted a lawyer, and the questioning was stopped. A rational juror could have determined that the later request by Mr. Shuler was a repetition of his earlier request that had not been honored. This is one of the reasons that Mr. Shuler's initial request—"Why can't -- I have an attorney talk with --?"—coupled with Mr. Shuler being interrupted by Sgt. Koo and the officers not acknowledging the request

- 3 -

satisfies the "some evidence" standard. Neither the circuit court nor this Court is the finder of fact charged with determining whether Mr. Shuler made a request for counsel that was cut off or ignored by the police officers who conducted the interrogation. It was for the jury to determine beyond a reasonable doubt whether Mr. Shuler's statement was obtained in violation of his right to counsel under Miranda and whether the statement met the constitutional voluntariness requirement.

There can be no serious dispute that a failure to honor a defendant's request for counsel may be considered in determining whether a subsequent statement was voluntary. See, e.g., Williams v. State, 375 Md. 404, 429, 825 A.2d 1078, 1092 (2003) ("[W]e look to all elements of the interrogation[.]"). The voluntariness inquiry looks to the totality of the circumstances surrounding the interrogation, including the officers' conduct and the defendant's condition. See id. at 429-30, 825 A.2d at 1092-93; Hill v. State, 418 Md. 62, 75, 12 A.3d 1193, 1200 (2011). If the jury found that the officers ignored or deflected a request for counsel, then the jury could consider that fact in deciding whether the statement was the product of a free and unconstrained choice.

The timing and circumstances of Mr. Shuler's interrogation also supplied some evidence of involuntariness. A statement is involuntary if the "totality of the circumstances" demonstrate that it was not "freely" made. Hof v. State, 337 Md. 581, 605, 655 A.2d 370, 382 (1995). Mr. Shuler had been arrested at approximately 7:53 p.m.,

but officers did not begin to question him until approximately 12:31 a.m. the next morning.[1] Mr. Shuler was left waiting alone for hours in a holding room before officers attempted to take the statement. When Sgt. Koo and Sgt. Hassan entered the holding room, Mr. Shuler was curled up on the floor in a corner, asleep. Mr. Shuler appeared disoriented and confused, prompting Sgt. Koo to ask Mr. Shuler whether he was alright. After this, the officers presented the advice of rights form and failed to acknowledge Mr. Shuler's request for counsel.

For over 70 years, this Court has required that the judge or trier of fact, *i.e.*, the jury, must decide beyond a reasonable doubt that a statement is voluntary before it may be used against a defendant in a criminal trial. See Jones v. State, 188 Md. 263, 268, 52 A.2d 484, 486 (1947) ("It is a settled rule that before a confession is admissible in evidence, it must be shown to have been freely and voluntarily made."). An instruction must be given if there is "some evidence" that would permit "a jury to rationally conclude that the evidence supports the application of the legal theory" set forth in the instruction. Hollins v. State, 489 Md. 296, 310, 328 A.3d 798, 807 (2024) (citation modified). The some evidence standard is an extremely low evidentiary standard. See Dykes v. State, 319 Md. 206, 216-17, 571 A.2d 1251, 1257 (1990). For a defendant to receive an instruction on voluntariness, there need only be "some evidence" of involuntariness developed at trial. See Hof, 337 Md. at 619-20, 655 A.2d at 389. The evidence may be presented by either the State or the

---

[1]The transcript of the interview that has been made part of the record and is attached as an appendix to the State's brief indicates that when Sgt. Koo directed Mr. Shuler to enter a date and time on the advice of rights form, Sgt. Koo told Mr. Shuler to enter "August 7th, 2021, 12:31."

defendant.  See id. at 620, 655 A.2d at 389.  In other words, the defendant need not testify or call witnesses to be entitled to an instruction on voluntariness.  See id. at 617-20, 655 A.2d at 388-89.  A defendant may be entitled to an instruction on voluntariness where the trial court has denied a motion to suppress a statement, finding by a preponderance of the evidence that the statement was voluntary.  See id. at 617-18, 655 A.2d at 388-89.

Under the "some evidence" standard, overwhelming evidence to the contrary does not defeat a defendant's entitlement to an instruction when the record contains evidence from which a reasonable jury could find the statement involuntary.  See Bazzle, 426 Md. at 551, 45 A.3d at 172 ("It is of no matter that the [] claim is overwhelmed by evidence to the contrary.  If there is any evidence relied on by the defendant which, if believed, would support his claim[,] the defendant has met his burden." (Citation modified)).  In this case, the evidence of Mr. Shuler's request for counsel, the delayed post-midnight questioning, Mr. Shuler having been asleep on the floor, and his apparent disorientation, under the totality of the circumstances, cleared that low bar.  As a result, consistent with our case law, Mr. Shuler was entitled to an instruction on voluntariness and the jury should have been permitted to decide beyond a reasonable doubt whether his statement was voluntary.

The Majority reaches the opposite conclusion by, in part, focusing on Mr. Shuler's trial testimony and that "Mr. Shuler did not testify to any circumstance that prompted his statement."  Maj. Slip Op. at 37.  At trial, Mr. Shuler explained that he told the officers he did not know anything about the shooting because he believed that if he admitted to shooting two people, he would lose any ability to claim self-defense.  From that testimony, the Majority concludes that Mr. Shuler's statement was not involuntary because "Mr.

- 6 -

Shuler did not testify that he felt *compelled* to speak—instead, he testified about *why* he was untruthful about not being involved, as opposed to giving his self-defense account of the events to which he testified at trial." Maj. Slip Op. at 37. In the Majority's view, Mr. Shuler did not speak because his will was overborne but rather he made a calculated decision about what to say and why to say it. See Maj. Slip Op. at 37 ("His testimony mentioned no circumstances that would allow a reasonable fact finder to find that his will was overborne such that his statement was involuntary. Far from it: Mr. Shuler's testimony indicated that he made a deliberate, strategic decision about what to tell the police about the incident."). The Majority also emphasizes that there was no direct evidence of coercion. See Maj. Slip Op. at 35. No officer threatened Mr. Shuler or raised their voices, nor promised or improperly induced Mr. Shuler, and Mr. Shuler did not testify that the officers' conduct forced him to speak. See Maj. Slip Op. at 35, 37. For the Majority, those facts mean that the voluntariness instruction was not generated.

The problem with the Majority's analysis is that it resolves factual questions that should have gone to the jury and shifts the burden to Mr. Shuler to present evidence to satisfy the some evidence standard. Mr. Shuler's testimony about why he lied to the police may be relevant to the jury's determination concerning voluntariness, but it does not negate that there was enough evidence developed at trial to warrant an instruction on voluntariness. A jury could have viewed Mr. Shuler's testimony as showing that he made a strategic choice or as evidence that the statement was involuntary. A rational juror could have determined that after Mr. Shuler asked about a lawyer, his request was ignored and he was forced to continue participating in an interrogation in which he was required to use

his own judgment about the consequences of stating that the shootings occurred in self-defense. Because Mr. Shuler made choices about what to say during the interrogation does not automatically prove that his statement was voluntary and, more importantly, does not establish that the evidence failed to satisfy the low threshold of the some evidence standard.

In concluding that Mr. Shuler was not entitled to an instruction on voluntariness, the Majority makes at least two critical errors. First, the Majority concludes that "Mr. Shuler failed to present 'some evidence' that his custodial statement was not voluntary[.]" Maj. Slip Op. at 35. However, to meet the "some evidence" standard, Mr. Shuler was not required to "present" evidence. See, e.g., Dykes, 319 Md. at 217, 571 A.2d at 1257 ("The source of the evidence is immaterial; it may emanate solely from the defendant. . . . If there is any evidence relied on by the defendant which, if believed, would support his claim . . . , the defendant has met his burden."). And, second, the Majority concludes that Mr. Shuler does not "appear to argue that his statement was the result of coercive police conduct." Maj. Slip Op. at 35. This observation implies that in the Majority's view Mr. Shuler must establish evidence of coercive conduct on the part of the officers to meet the some evidence standard and be entitled to an instruction on voluntariness. The observation is both factually and legally wrong. On brief, Mr. Shuler argues that "the Appellate Court erred by requiring specific evidence of 'coercive' 'physical circumstances' or 'improper inducement[s].'" (Alteration in original). Mr. Shuler contends that under the constitutional and common law tests for voluntariness, "courts must look to the totality of all the surrounding circumstances—both the characteristics of the accused and details of the interrogation[,]" and that "the presence or absence of a single controlling criterion is never

- 8 -

decisive." (Citation modified).

Mr. Shuler is correct. Voluntariness is assessed under the totality of the circumstances. See, e.g., Hof, 337 Md. at 605, 655 A.2d at 382 ("The jury's voluntariness determination [] requires consideration of the totality of the circumstances surrounding the making of the statement." (Citation omitted)); Jarvis v. State, 487 Md. 548, 566, 321 A.3d 1, 11 (2024) ("[C]ircumstantial evidence and reasonable inferences drawn therefrom can satisfy the 'some evidence' standard[.]" (Citation omitted)). The voluntariness inquiry requires a determination as to whether the defendant's statement was the product of his own free and rational choice, rather than the result of coercive police conduct that overbore his will. See, e.g., Hill, 418 Md. at 75, 12 A.3d at 1200. That determination turns on the circumstances surrounding the making of the statement, such as what law enforcement officers did, *e.g.*, the manner in which the interrogation was conducted, what pressures were applied, and whether the defendant's decision to speak was genuinely voluntary. See, e.g., Hill, 418 Md. at 75, 12 A.3d at 1200-01; Williams, 375 Md. at 429-30, 825 A.2d at 1092-93.

The Majority's holding does more than decide whether the record contains "some evidence" that generated an instruction on voluntariness. It draws inferences and conclusions from disputed facts, agrees with the State's interpretation of Mr. Shuler's testimony and interrogation, and, after making factual findings, concludes that Mr. Shuler failed to "present" some evidence that the statement was not voluntary. See Maj. Slip Op. at 35-43. In determining whether a jury instruction on voluntariness should have been given, this Court's role is not to decide which facts or inferences are more plausible or

whether the defendant presented sufficient evidence but to determine whether there was some evidence of involuntariness. In this case, there was.

Our case law adopts a two-tier approach to the determination of the voluntariness of a custodial statement. A trial court first decides admissibility by a preponderance of the evidence. See Hof, 337 Md. at 604-05, 655 A.2d at 382. If the court admits the statement, the jury still has a separate role in deciding voluntariness beyond a reasonable doubt. See id. at 605-06, 655 A.2d at 382. The question is whether the defendant is entitled to an instruction on voluntariness, *i.e.*, whether "some evidence" of involuntariness has been generated. See id. at 619-20, 655 A.2d at 389.

Properly understood, our holding in Hof supports Mr. Shuler's position, not the State's. In Hof, 337 Md. at 600, 655 A.2d at 379-80, this Court rejected the idea that a statement is automatically voluntary just because police officers gave Miranda warnings and obtained a waiver. In Hof, 337 Md. at 600-01, 655 A.2d at 379-80, we stated:

> Whether the police informed the defendant of his or her *Miranda* rights before the defendant made a statement is not the sum and substance of voluntariness; meticulous compliance with *Miranda* does not answer the question whether the confession was voluntarily made. All of the circumstances under which the statement was made, both before and after *Miranda* warnings were given, need also to be considered. Thus, the voluntariness determination requires the jury to consider factors other than compliance with *Miranda*. Among other things, the circumstances may include how long the defendant was in custody, his or her mental capacity, and, as in the case *sub judice*, the extent to which the defendant was under the influence of narcotics.
>
> A jury instruction focused primarily on whether there has been compliance with *Miranda* is insufficient as a voluntariness instruction. This is so because such an instruction does not provide the jury with guidance necessary to determine whether the confession was made voluntarily; it does not define

"voluntary" or provide a meaningful explanation of the voluntariness standard.

(Citation modified).

We explained that Miranda did not replace Maryland's independent voluntariness law; it only added procedural safeguards to it. See Hof, 337 Md. at 605-06, 655 A.2d at 382. Voluntariness requires the jury to consider the totality of the circumstances surrounding the statement. In this case, during the Miranda advisement, when Mr. Shuler asked why he could not have a lawyer, the officers did not stop the interrogation or explain that questioning would end if he wanted a lawyer. Instead, the officers continued the waiver process and questioned Mr. Shuler. Mr. Shuler was questioned after a delay in the early morning hours, after he had spent hours in a holding room. Based on the evidence, the requirement that there be "some evidence" that Mr. Shuler's statement was involuntary was met and a jury instruction on voluntariness was warranted. At a minimum, the circuit court should have given a modified voluntariness instruction tailored to the evidence.

I am unpersuaded by the State's assertion that even if the trial court erred in failing to give the voluntariness instruction, any alleged error was harmless beyond a reasonable doubt. Without the admission of Mr. Shuler's prior inconsistent statement, the jury may have believed Mr. Shuler's testimony and acquitted him of all of the murder charges, including manslaughter. It cannot be determined beyond a reasonable doubt that admission of the statement for impeachment purposes was harmless.

In Gonzalez v. State, 487 Md. 136, 147-48, 185-86, 316 A.3d 484, 490-91, 513 (2024), where the trial court erred in determining that the defendant failed to establish a

- 11 -

sufficient factual foundation for cross-examination of a witness, who was the victim of the alleged assault, about the witness's U visa application, we held that the trial court's error was harmless beyond reasonable doubt as the defendant testified to committing acts that formed the basis of offenses for which he was convicted. In Gonzalez, id. at 185-87, 316 A.3d at 514, the defendant's testimony established that he committed certain offenses and not others. The jury acquitted the defendant of more serious offenses that he did not acknowledge having committed and convicted him of three assault offenses for which his own testimony established guilt. See id. at 187, 316 A.3d at 514. Given that the defendant had acknowledged in his testimony facts sufficient for conviction of the three assault offenses, based on that and with other evidence adduced at trial, we concluded that the trial court's error in excluding evidence of the witness's U visa application was harmless. See id. at 189, 316 A.3d at 515.

This case is not like Gonzalez. Mr. Shuler's testimony was sufficient to generate a jury instruction as to both self-defense and imperfect self-defense. Had the jury believed Mr. Shuler's testimony in its entirety, Mr. Shuler may have been exonerated of all of the murder charges, including manslaughter. The admission of Mr. Shuler's statement severely undermined his credibility and cannot be said to have been harmless beyond a reasonable doubt.

For the above reasons, respectfully, I concur in part and dissent in part.

Circuit Court for Baltimore City
Case No.: 121306006
Argued: May 5, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 57

September Term, 2025

_____

MONTAY D. SHULER

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Concurring and Dissenting
Opinion by Biran, J.

_____

Filed: July 20, 2026

Respectfully, I concur in part and dissent in part. I do not join Part III.E. of the Majority opinion, in which the Majority concludes that Mr. Shuler failed to present "some evidence" that his custodial statement was not voluntary. On that issue, I agree with the dissenting portion of Justice Watts's separate opinion.

However, I join the remainder of the Majority opinion, including Part III.F., in which the Majority concludes that any error in failing to give a voluntariness instruction was harmless beyond a reasonable doubt. Accordingly, I concur in the judgment affirming Mr. Shuler's convictions.